# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ADRIAN ESQUER,<br><br>      Petitioner,<br><br>    v.<br><br>STU SHERMAN,<br><br>      Respondent. | Case No. 1:17-cv-01191-DAD-SAB-HC<br><br>FINDINGS AND RECOMMENDATION RECOMMENDING DENIAL OF PETITION FOR WRIT OF HABEAS CORPUS |

Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.

## I.

## BACKGROUND

On January 31, 2014, Petitioner was convicted after a jury trial in the Tulare County Superior Court of: six counts of attempted murder, four of which were committed with premeditation and deliberation, and two counts of assault with a firearm. (3 CT[1] 682–702). The trial court sentenced Petitioner to four terms of life with the possibility of parole, six terms of twenty-five years to life, and a total determinate term of twenty-five years and eighth months. People v. Esquer, No. F069292, 2017 WL 1315678, at *1 (Cal. Ct. App. Apr. 10, 2017). On April 10, 2017, the California Court of Appeal, Fifth Appellate District ordered modifications to

---

[1] "CT" refers to the Clerk's Transcript on Appeal lodged by Respondent on February 27, 2018. (ECF No. 19).

the judgment regarding minimum parole eligibility terms and various enhancements. The judgment was otherwise affirmed. Id. at *27. The California Supreme Court denied Petitioner's petition for review on July 19, 2017. (LDs[2] 11, 13).

On September 5, 2017, Petitioner filed the instant federal petition for writ of habeas corpus. (ECF No. 1). In the petition, Petitioner raises the following claims for relief: (1) an erroneous contrived self-defense jury instruction; (2) admission of hearsay evidence; (3) ineffective assistance of counsel; and (4) an unconstitutional sentence. On January 25, 2018, Respondent filed an answer. (ECF No. 17). Meanwhile Petitioner, proceeding *pro se*, filed another petition for review, which the California Supreme Court denied on March 14, 2018. (LD 15; ECF No. 20-1).

## II.

## STATEMENT OF FACTS[3]

### I. Prosecution's Case

### A. Bystanders' Testimony[4]

Michael Gutierrez was a shift manager at the pretzel shop in the mall. On the evening of January 27, 2012, he saw four men walking together from the northern mall entrance. The tallest man in the group had a "red ... rag" hanging out of his jeans pocket, and Gutierrez perceived the men to be gang members based on their clothes and the way they expressed themselves. They stopped just past the pretzel shop and the tallest man, identified as Andy Nanez, gestured for two of them to go one way and two to go the other. Nanez and an unidentified man then went toward Macy's on the south side of the mall while the other two men, identified as Esquer and Hanson, went toward the candy store. Gutierrez subsequently heard multiple gunshots and called 911.

Gabrielle Stepp and Linden Grim were at the mall with two other friends and had just finished having dinner. They were having a conversation outside the candy store when they heard what sounded like a couple of firecrackers. Grim's back was to the candy store and when she turned around, she saw a man with a gun. One of their friends yelled, "Gun, run," and she ran. Stepp, who was facing the candy store, testified that the initial firecracker sounds were followed by approximately 10 more firecracker sounds. As she stood there frozen, she saw a young man, identified as Esquer, inside the candy store following a male clerk

[2] "LD" refers to the documents lodged by Respondent on February 27, 2018. (ECF No. 19).
[3] The Court relies on the California Court of Appeal's April 10, 2017 opinion for this summary of the facts of the crime. See Vasquez v. Kirkland, 572 F.3d 1029, 1031 n.1 (9th Cir. 2009).
[4] The identification of Esquer and Hanson was not a disputed issue at trial. The two were known to law enforcement, the crimes were caught on mall surveillance video and they were identified by eyewitnesses. Because their identification was not in dispute, we omit witnesses' descriptions of them from our summary, except where relevant or necessary for clarity.

and firing a gun at him. Another man with a light complexion, identified as Hanson, stood by the shooter as bystanders ducked and ran. The two men then ran out of the store, eastbound. Stepp testified she did not identify anyone to police because she saw only the men's profiles, but she identified Hanson as looking like the man who stood next to the shooter.

Nicholas Myers was sitting on a bench waiting for his girlfriend. He was facing the candy store and a store called Hollister when his attention was caught by an apparent argument and he looked over. He heard some words being shouted in Spanish, the word "buster," and a store clerk saying, "You guys can't be doing this. Why are you guys doing this? This is a store. You guys can't be doing this." He saw a back and forth argument going on between two men outside the store and four larger men inside the store. He testified that both men outside the store were saying things, standing shoulder to shoulder, when one of them pulled out a gun from his waistband, pulled back on it, and opened fire. The two men then ran past Hollister toward the food court. Myers saw one man lying down bleeding and another one holding his leg.

He identified Hanson as the man standing next to the shooter, and he testified Hanson was "talking shit." He also testified that Esquer and Hanson did not go inside and the four men inside did not come out.

David Delgado–Martinez and his cousin had driven to In–N–Out Burger to get food. Delgado–Martinez, who was the passenger, observed two men together. The shorter of the two men threw a revolver under a bush and then returned to cover it up. After Delgado–Martinez got home, his wife called the police. When he returned to the parking lot with police, officers were in the process of retrieving the gun from the bush. He told the police sergeant who interviewed him that night that he heard the taller man say, "Hurry up, hurry up. Just leave it. Let's go."

**B. Victims' Testimony**

### a. Sylvia A.

Sylvia A. was a sales clerk at the candy store. She testified that three large men came into the store to shop for candy.[5] Three other men walked by the store and then came back.[6] One of the men, Esquer, started calling to the group of men inside the store, like he wanted to fight.[7] Sylvia told them they needed to take it outside and to leave. She testified Esquer never entered the store, but was right at the entrance. He started shooting at one of the men inside the store and then shot in an arc around the store. Sylvia ducked down. Two men in the store were hit, Miguel A. in the neck and Stephen H. in the leg.

Sylvia testified she did not hear or see anything prior to the shooter calling out to the men in the store, and she saw no weapons other than the shooter's gun.

### b. Stephen H.

Stephen H. was shopping for candy while talking on his cell phone. He had not been in the store long when he heard one or two shots. He looked over and saw a

---

[5] Other evidence, including video footage from the mall's surveillance system, showed there were four men: Jose S. and brothers Miguel A., Jose A. and Felipe A.

[6] Although there were shoppers around generally, there was no other evidence Esquer and Hanson were with a third man in front of the candy store.

[7] Sylvia initially testified the man outside was calling to the men inside, but in subsequent testimony she stated the shooter was calling out in particular to the man he shot in the neck, Miguel A.

man shoot toward the register and then toward a corner. The man then turned toward Stephen, looked at him and shot him in the leg. The bullet went through his right leg and hit his left.

Stephen testified he did not hear anything prior to the shooting, as he was focused on his phone conversation.

### c. Miguel A.

The four men inside the candy store challenged by Esquer and Hanson were brothers Miguel A., Jose A. and Felipe A. and their friend Jose S. All four testified at trial reluctantly.

Miguel was shot in the neck, elbow and leg by Esquer. He testified he and his brothers were at the candy store on the evening of January 27, 2012, with Jose. S., but he remembered almost none of the events that occurred. He stated he went to the candy store and then woke up in the hospital. He also stated he did not remember speaking with detectives, but acknowledged he gave a true statement at the time of the shooting.

He acknowledged at trial that his brother, Felipe, has gang tattoos and he was not telling "the whole truth" when he told the officer his brothers were not in a gang. Miguel identified Esquer in court as the man he had identified as the shooter.

On cross-examination, Miguel testified he did not know two of his brothers had knives on them and he did not remember what was said. He testified the shooter was aiming at him from outside the front of the store, but no words were spoken. He also did not remember anyone saying "busters" and he denied ever using the word, although he acknowledged it is used to initiate a confrontation with "Northerners." Miguel denied knowing what "Loco Park" was and he denied claiming a gang, but he acknowledged he and his brother had been arrested for being involved with gangs.

In his statement to police, Miguel said he did not know the shooter or his companion and had not seen them at the mall prior to the shooting. He said they wanted to start a fight with his group, they probably thought he was a gang member and they were flashing a lot of red. Miguel also said the shooter had a red rag hanging from his back pocket and he shot at Miguel and another man with a .22–caliber handgun. He denied he and his brothers associated with gangs, and he said a year before, his house was shot at twice, which he attributed to Northerners.[8]

### d. Jose A.

Jose A. testified he did not remember anything about the evening of January 27, 2012, including going to the mall. Regarding a photo taken from the mall surveillance footage that evening, he acknowledged he and his two brothers were pictured, but he stated he could not tell who was who and he denied recognizing the fourth man (Jose S.). He also denied he and his brothers were involved with any gangs, denied knowing what his brother Felipe's "S.S." tattoo stood for, and initially denied remembering his brother Miguel was shot in the neck. After viewing a photograph of Miguel's neck wound, he recalled the injury, but denied remembering any of the circumstances surrounding it. He testified he wears blue sometimes, the color blue is associated with "South" and red is associated with "North, Northerners."

---

[8] Miguel testified at trial that he did not know who shot at his house.

On cross-examination, Jose A. conceded his brother's tattoo signifies "South Side," and calling a Northerner "buster" is confrontational and a way to provoke a fight. He denied ever calling anyone a buster, however, and he testified he did not remember having a knife on him, admitting he had a knife to Officer Jennings or hiding the knife.

### e. Felipe A.

Felipe testified he was at the mall the night of January 27, 2012, with his brothers and Jose S., but he did not remember anything happening at the candy store. He testified his brother Miguel was shot and hospitalized, but he did not remember any of the surrounding circumstances. He refused to say whether he was affiliated with any Southern gangs and, on cross-examination, he denied familiarity with the term "buster."

The night of the shooting, Felipe gave a statement to police and identified Esquer and Hanson. He said his group was approached by the two at the candy store. Esquer said, "You guys want some?" and "Nortes," and pulled up his shirt to reveal a gun. Esquer repeated, "You guys want some? You guys want some?" and he pulled the gun out, removed the safety and starting shooting. Felipe stated neither Miguel nor Jose S. displayed any weapons, and he and Jose A. had knives on them, but he did not pull his out. He was not sure if Jose A. pulled his knife out, but stated Jose A. threw his knife away. Felipe also stated he was a Southerner and a Loco Park member, but the others were not.

### f. Jose S.

Jose S. testified he was at the mall on January 27, 2012, with Miguel A., Felipe A. and Jose A. After they went to the candy store, he heard arguing and turned around to see Esquer arguing with Miguel. Esquer then pulled out a black handgun and started shooting.

Jose S. recognized Esquer as someone he went to school with, but he did not know Esquer's name or have any problems with him at school. Jose S. denied having any weapons on him and denied having ever been a Sureño gang member.

## C. Hanson's and Esquer's Statements to Police

Hanson was taken into custody at his house in the early morning hours of January 28, 2012. Esquer was located at his father's house on January 29, 2012. Detective Fahoum took recorded statements from both defendants, which were played for the jury.

In his statement to police, Hanson said little. He asked what his charges were and about his mom and family. He denied shooting anyone, touching any gun or being in the mall, but he discussed his tattoos and admitted being a "Visalia Boy" his entire life.

Esquer denied he was a member of the Norteños, but admitted he associated with them and they had one another's backs. He denied anything was planned and said the shooting was precipitated by a verbal argument with the group in the candy store "just talking shit" to him and saying things like "chaps" and "busters." Esquer knew one of them from school. He stated he did not see anyone in the group pull a weapon and he did not say anything while he was shooting. He also

admitted the gun was his, he hid the gun by In–N–Out Burger and it was his "hit."[9]

**D. Investigation and Gang Evidence**

### 1. Physical Evidence

One projectile, nine shell casings and three bullet holes were located in and around the candy store, and a Browning Buck Mark .22–caliber long-rifle semiautomatic handgun and magazine were recovered from under a bush near In–N–Out Burger. The shell casings were matched to the gun. No fingerprints were located on the shell casings, no fingerprints of value were recovered from the gun and although DNA was recovered from the gun, no interpretation was done because it was a mixture from two or more people and the quantity was insufficient for a complete analysis.

### 2. Detective Jennings

Detective Jennings was off duty on January 27, 2012, but responded to the mall after hearing shots had been fired at approximately 6:53 p.m. He interviewed Jose A., who was wearing blue and white plaid shorts. Jose A. identified Esquer and Hanson as the only two involved. He said they were talking loudly and Miguel turned around when they said, "Norte." He stated Miguel did not "square[ ] off" against them. Esquer said, "You want some of this?" and then lifted his shirt, pulled a gun and started shooting. Hanson stood there texting. Jose A. said Esquer had a red bandana hanging out of his pocket, which meant "Northern" to him, and Hanson had a red rag around his neck. Jose A. thought the shooting was gang related because his brother Felipe associated with Loco Park, a Southern gang, and had a large "S" tattooed on each arm. Jose A. stated he had a pocketknife on him, but he did not take it out while he was in the mall. After the shooting, he threw it in some bushes outside the mall.

Detective Jennings also interviewed Felipe, whose statement was summarized, *ante*, and he was present for Hanson's arrest. He testified that as Hanson was being handcuffed, he stated, "I'm going away for a long time on this one."

### 3. Detective Fahoum

Detective Luma Fahoum[10] testified she had been a peace officer for 14 years and was in the gang suppression unit for six and one-half years. She was assigned to the mall shooting as the lead detective. Fahoum was familiar with Hanson and his family, and she had met him numerous times. She had also seen Esquer numerous times, but met him only once. Fahoum responded to the mall following the shooting and, after speaking with a number of witnesses, she provided Jennings with Esquer's and Hanson's names for placement in a lineup, based on witnesses' descriptions, Jose A.'s and Jose S.'s identification of the shooter as "Adrian," and her knowledge that Esquer and Hanson were commonly seen together.

Fahoum viewed the mall surveillance video and testified that four Sureño associates—Miguel, Jose A., Felipe and Jose S.—walking in the mall caught her attention and that of the four, Felipe was a validated member. She also testified that his "S.S." tattoo meant "South Side" and demonstrated "his allegiance to Southern gangs where everyone can see it."

---

[9] Esquer denied making that statement during cross-examination. On redirect, he testified it was possible he said "[t]hat's my shit" rather than "[m]y hit."

[10] Fahoum had been promoted to sergeant by the time of trial.

Prior to the shooting, surveillance footage showed Esquer and Hanson at the north entrance of the mall, which intersects with the pretzel shop. Walking ahead of them was Nanez and an unidentified man who kept his hand in his pocket the entire time. Surveillance footage did not show them in the mall prior to this time. The men subsequently broke off, with Esquer and Hanson heading west toward the candy store and Nanez and the unidentified man heading south toward Macy's. Fahoum did not observe either group of men stop and enter any store during their time in the mall, and she observed Nanez on his phone.

Also at the mall prior to the shooting were Nathan Hiser, who was wearing a red shirt, and Christopher Burris. Hiser and Burris spent a lot of time together and were walking together, at one point shaking hands. They had been there awhile. Approximately 13 minutes before the shooting, Miguel A., Jose A., Felipe A. and Jose S. walked past the optometrist office in the mall. Hiser and Burris were in that area of the mall around the same time.

Around the time of the shooting, Hiser and Burris were at the food court and Nanez and the unidentified man were in front of a store in the corridor leading to the food court.

Esquer and Hanson were captured on video looking into the candy store and, approximately 30 seconds later, people were seen running for shelter.[11] As Hanson ran following the shooting, he had a cell phone to his ear. Nanez and the unidentified individual were seen running.

Fahoum testified that the shooting occurred within one minute and 20 seconds from the time Esquer and Hanson entered the mall. She also testified there were 16 phone calls between Esquer, Hanson and Nanez between the times of 6:50 p.m. and 7:16 p.m.[12] Robert Douglas, a senior police identification technician, testified that Hanson called Nanez's number eight times in a row between 6:52 p.m. and 7:00 p.m.

### 4. Officer Peña

Officer Josh Peña, a sworn peace officer of 10 years, had been assigned to the gang suppression unit for four years. He recognized both Esquer and Hanson from prior contacts he had with them. He also had more than 10 contacts with Nanez.

Peña testified that he and Esquer's probation officer had a probation contact with Esquer on April 15, 2012, at a nightclub.[13] Esquer was there by himself, but his cell phone contained text messages between Esquer and Nanez.

Peña also had contact with Esquer on September 30, 2011, and December 2, 2011. The former contact with Esquer was made at Hanson's house and the second contact occurred during a call for service at the house of a known Norteño gang member. There were approximately eight Norteño members in the house, including Esquer, Hanson and Nanez. Peña also testified that between 2010 and 2012, he had more than five contacts, approximately, with Esquer and Hanson when they were together. Peña identified Nanez in one of the photographs of the mall from the shooting investigation.

---

[11] The first 911 call was received at 6:52 p.m.

[12] As the seconds are not relevant, we omit them.

[13] Peña clearly misspoke when identifying this contact occurring on April 15, 2012, as Esquer was in custody for the present crimes on that date. Officer Flaws testified that this contact occurred on April 15, 2011. It is clear from Flaws's testimony, however, that it is the same contact.

### 5. Officer Flaws

Officer Nathan Flaws was the prosecution's gang expert. Flaws was a sworn peace officer for 15 years, more than 10 years of which was with special enforcement units in the gang task force. He received formal gang training through the academy and a field training program, attended a gang conference annually, and had at least 200 hours of Police Officers' Standards and Training and another 200 to 300 hours of other local and officer related training. Flaws was a member of a Tulare County Gang Officer's Association, the California Gang Investigators' Association, the California Narcotics Officers' Association, the National Tactical Officers' Association and the California Tactical Officers' Association.

Additionally, in 2010, he, along with Fahoum, participated in Operation Street Sweeper, a wiretap case in Tulare County that targeted gang members and demonstrated the role played by cell phones in organizing and strategizing gang crime. Both Flaws and Fahoum testified regarding the invaluable insight they gained into the inner workings of gangs as a result of that operation, and Flaws testified that in particular, Northern gang members in Visalia were using phones to organize and strategize crimes. During the operation, law enforcement intercepted tens of thousands of calls related to Northern gang members.

#### a. Background Information on Norteño Gang

Flaws testified that Northern gangs, or Norteños, began in Visalia in the early 70's and they are predominately, although not always, Hispanic gangs. The gang identifies with the numbers four and 14, with 14 relating to the number N, which is the 14th letter in the alphabet. The gang also identifies with the color red, and Flaws explained that gang members "fly their colors," often with a bandana around their neck, face or head, to show where they are from or intimidate other gang members. There were approximately 300–plus active members in the Visalia area. Southern gang members, or Sureños, are rivals of the Norteños and they associate with the color blue, the number 13 and the letter M. Specific to Visalia, the Norteño gang's other enemy is the Oriental Troop gang, which is an Asian gang.

Flaws also testified that gangs like to take photos of themselves, usually throwing gang signs with fellow gang members wearing gang clothing, and particular gang members are often given monikers or nicknames.

#### b. Primary Activities and Predicate Offenses

Flaws testified that the primary activities of the Norteño gang are homicides, assaults, shooting at inhabited dwellings, vandalism and other various crimes.

The first predicate crime described by Flaws involved Javier Solis, a documented Norteño, who stabbed someone to death in Visalia on May 7, 2007. Flaws testified Solis was convicted of murder, assault with a deadly weapon and a gang allegation. The second predicate crime involved documented Norteño gang members Victor Tovar, Benjamin Solis and Anthony Nanez, who on July 17, 2007, shot into the bedroom window of a Visalia house where rival gang members lived. Tovar was convicted of two counts of attempted murder, shooting into an inhabited dwelling and a gang allegation.

#### c. Evidence of Norteño Gang Membership

Based on his communication with other police officers, police reports, police contacts, field identification cards, their tattoos, and a personal contact with

Hanson, Flaws opined that both Hanson and Esquer were Norteño gang members.[14]

Specifically, Flaws testified Hanson was an active Norteño gang member based on his self-admissions, gang associated tattoos, the gang attire he wore during police contacts, his involvement in and commission of gang-related crimes and his placement in the predominantly Norteño housing unit at the Tulare County Jail.

Flaws testified Esquer was a validated Norteño gang member at the time of the crime based on his self-admissions and gang tattoos, the gang attire he wore during police contacts, photographs showing him throwing gang signs, and his involvement in gang-related crimes.[15]

Flaws also testified that based on his review of the information and reports in Nanez's gang packet, photographs of him wearing red with gang tattoos and throwing gang signs, and the other gang members he associates with, Nanez was a Norteño gang member. Additionally, based on gang contacts and field identification cards, Flaws testified Felipe A. was a Loco Park Sureño gang member, and Miguel A., Jose A. and Jose S. were Sureño associates.

## 1. Tattoos

Flaws testified that not all tattoos are gang related and Hanson had an "evil ways" tattoo on his arm that was apparently not gang related. However, Hanson had four dots on his elbow, which is a very common Norteño gang tattoo and relates to the number four or 14. He also had "Visa," for Visalia, on his left index finger with four dots next to it; the block letter "N" for North or Norteño; and "VB" and "X4" for Visa Boys, a Norteño subset. Hanson also had a "G" and a "K" for "gook killer," another common gang tattoo in derogatory reference to Asians or the Norteño gang's rival, Oriental Troop.

Esquer also had four dots tattooed on his left elbow, an "X" on the back of his left arm and a "4" on the back of his right arm for the number 14, and a single dot on his right elbow. Flaws testified that four dots on one side of the body and a single dot on the other are also very common and signify the number 14. Esquer had tattoos of the letters "G" and "K" as well, on the tops of his hands, and Hanson had a photo of this tattoo on his phone.[16]

Flaws testified that often, certain gang tattoos have to be earned. Depending on gang leadership or the members at any given time, that might mean committing a shooting or engaging a rival gang member in a fight. While the requirement might vary, individuals were required to "earn" the tattoo or "put in work" for it.

---

[14] Norteño, Norte, Northern and North refer to the Norteño street gang, and Sureño, Southern and South refer to the Sureño street gang, and the terms were used interchangeably by witnesses.

[15] On cross-examination, Flaws testified that the only gang-related crimes Esquer had been involved with were the crimes charged in this case. On redirect, he testified that although there was no arrest, gang crimes and sales were involved in a police contact in April 2010, described *post.*

[16] Flaws testified that Oscar Arzate, known as "Boots," was a Norteño gang member who was shot and killed by an Oriental Troop gang member. Esquer was photographed displaying his "G" and "K" tattooed hands over Arzate's grave while throwing a one and a four. Flaws testified that was a "specific tattoo" with "definitive meaning" rather than "just a casual tattoo" and have it displayed over the grave of a dead gang member killed by an Asian gang member had "serious meaning."

## 2. Police Contacts

Flaws testified about approximately 18 police contacts involving Hanson and 12 police contacts involving Esquer.[17] Of those contacts, he was personally involved in one and Fahoum and Peña were personally involved in several. Flaws briefly detailed each contact and, because the contacts are relevant to our analysis under *Sanchez*, we summarize them.

### a) Hanson

In 2007, Hanson told Officer Arjona he was a Norteño, hung out with Norteños, and was on a "no-red contract" at school, which prohibited him from wearing red.[18] On July 20, 2007, Officer Short prepared a field interview card documenting that Hanson had provided a moniker of "Huero."

On January 10, 2009, while Hanson was on a "no-red contract," he got into a fight with a student who was a Sureño on a "no-blue contract." Hanson was accused of calling the student a "scrap," a derogatory term for Sureños, and the student was accused of calling Hanson a "buster," a derogatory term for Norteños. Flaws testified those terms are direct insults and "very often" provoke a reaction.

During a contact on April 9, 2009, Hanson had an open container of alcohol and was wearing a red "Visalia" hat. He stated his moniker was "Huero," he had been a North Side Visa Boy since age 10 and he had been jumped into the gang.

On August 11, 2009, an officer observed an altercation at a bus stop after which some people entered a vehicle and fled. The vehicle was subsequently stopped, and Hanson and two other validated Norteño gang members were inside. Hanson was wearing a red T-shirt.

On August 23, 2009, Fahoum and Officer Alfano conducted a traffic stop. Hanson was present and in the company of very well-known Norteño gang members, including one of the primary targets in Operation Street Sweeper. Flaws testified this "show[ed] what [Hanson's] gang involvement was to associate with somebody of this stature." Flaws also separately testified Hanson was arrested on August 23, 2009, for possession of a dagger and during a phone call with probation, his grandmother said he was a gang member and "out of control at that time."[19]

During a contact on September 11, 2009, Hanson was wearing gang clothing in the form of a red bandana and a red hat with "TC" on it, for Tulare County. On November 20, 2009, Hanson told Alfano he was jumped into the Norteño gang and had been a member since the age of 10. He was wearing a red hat with "TC" on it and a belt buckle with a "V" for Visalia.

---

[17] For reasons unclear from the record, the prosecutor did not elicit testimony on Hanson's and Esquer's numerous police contacts in chronological order. In addition, or perhaps as a result, there was testimony by Flaws at different junctures in his examination that involved the same date. Whether that testimony pertained to the same contact or to multiple contacts on the same date is not entirely clear. We note the absence of any objection to Flaws's testimony on the police contacts.

[18] Flaws explained that when kids wear predominant gang colors or "fly their colors" at school, they are looking for trouble. In an effort to avoid some of these confrontations, officials use these contracts to prevent kids from wearing gang colors to school.

[19] It is unclear if this is the same contact or a separate contact, as Flaws testified about these contacts at different junctures in his testimony.

On February 12, 2010, Flaws and Officer Moffett had contact with Hanson. Hanson had discarded a red bandana, which Flaws testified was significant because he was "fly[ing]" his gang color. Hanson admitted "he was a Norteño from Holiday Homes." On July 3, 2010, patrol officers responded to a report of a possible gun and found Hanson, his brother Daniel Hanson and two other men, all of whom were validated Norteño gang members, together. Daniel Hanson was arrested for possession of a gun.

On October 16, 2010, a probation officer contacted Hanson, who had a piece of paper with "North Side Visa Boy" written on it in his possession. On December 25, 2010, officers responded to a report of shots fired. They found Hanson along with three other men. All of those at the location were validated Norteño gang members and were arrested. During a probation contact on December 26, 2010, Hanson stated he was a "Northern gang member" and belonged to "MGB" or "Mexican Gang–Bangers," a Norteño subset. Hanson was involved in a gang crime and officers documented that he was an active Norteño.

On February 17, 2011, a probation officer found Hanson, who was wearing a black "TC" hat, with a validated gang member and arrested him for violating his probation by associating with another gang member. Flaws also testified that on February 17, 2011, Hanson was arrested for congregating and associating with gang members, in violation of his condition of probation.[20]

On March 31, 2011, Hanson was arrested for violating a gang injunction and he stated he was a member of the North Side Visa Boys, a Norteño subset. At that time, he had the left arm tattoo and the "Visa" tattoo on the side of his finger, and "his mother was aware that he was aware that he was not supposed to violate the gang injunction; however, he still went out and did so."[21]

Finally, on April 9, 2011, Hanson and three other men were stopped by Officer Whaley. All were validated gang members and the officer documented Hanson's tattoos. Hanson explained the four dots tattoo and that his "VB" tattoo was for "Visa Boys," and he said he "earned" the tattoos. He also said he had been jumped into the Norteño gang.

**b) Esquer**

Esquer was contacted by Moffett on February 12, 2010, and he was in the company of two validated Norteño gang members. On April 2, 2010, he was contacted by Alfano while in the company of several well-known Norteño gang members, including Daniel Hanson. The officer recorded that all were Norteño gang members. On April 2, 2010, Esquer had contact with Alfano and was arrested for methamphetamine possession.[22] He admitted to Alfano "that he backs up the north," "kicks it with the Norteños" and "fought scraps at school."

On February 2, 2011, Esquer was contacted by Officer Collins. He admitted Norteño gang membership and showed his gang tattoos.

---

[20] Although this appears to be part of the same police contact, Flaws testified about them separately at different junctures in his examination.

[21] The tattoo on Hanson's left arm referred to by Flaws appears to be one of the tattoos he previously described, but the record is not clear as to which tattoo.

[22] It is unclear if this is the same contact or a separate contact, as Flaws testified to these contacts at different junctures in his testimony.

Flaws testified that Peña had contact with Esquer on April 15, 2011, at which time Peña connected Esquer with both Nanez and Hanson. On April 16, 2011, Esquer was contacted regarding a vehicle chase and he was in the company of three men, at least one of whom was a Norteño gang member. On April 19, 2011, he was contacted by Officer Logan in an area where Norteño gang members associate. The officer noted Esquer's tattoos and that he was associating with other Norteños.

On July 13, 2011, Esquer was contacted by Collins while with a large group of Norteños. He admitted he was a Norteño and the officer noted his gang tattoos and red crucifix.

On July 27, 2011, Esquer was in the company of another validated Norteño gang member and the officer recorded that both men were documented Norteños. On September 2, 2011, Esquer was contacted by Collins while in the company of several Norteños.

On September 30, 2011, Peña had contact with Esquer and Daniel Hanson, who was at one time a Norteño member. Peña noted Esquer had previously denied gang membership, but Peña knew him to be a gang member based on conversations with other gang members and photographs. Additionally, Esquer had gang tattoos and there was a photograph "depicting" NSV (North Side Visa) membership based on hand signs he was throwing.

Finally, on December 2, 2011, Alfano responded to a party in Visalia. Esquer was there with numerous Norteños, and a sawed-off shotgun and ammunition were located in the residence.

### d. Hypotheticals

#### 1. First Hypothetical
The prosecutor was proceeding on two theories, uncharged conspiracy and aiding and abetting, and in eliciting testimony regarding the gang enhancement, she presented two hypotheticals to Flaws. The first hypothetical involved two validated Norteños who went to the mall, one with a red bandana around his neck and the other with a red bandana hanging out of his back pocket. A third gang member was at the mall, along with an unidentified man. The three gang members had been previously contacted by police while in one another's company, and they had been in contact with each other all day and were in contact with each other 8 to 11 times within 8 to 11 minutes. They were within feet of one another at the mall entrance and the third gang member looked back at the first two gang members. One witness saw hand signals indicating two would go one direction and the other two would go another direction.

The two gang members of apparently average size passed a store, backed up and encountered four Sureños, at least three of whom appeared large in size. Gang slurs of "Norte" and "buster" were overhead and no weapons were seen except for the gun one of the two gang members pulled out. He opened fire with his fellow gang member standing by his side, appearing to be on the phone. The shooter shot at a clerk, a civilian and a rival gang member, spraying the store, and he then shot at someone running down the south hall. Phone records showed calls between the three gang members shortly before and after the shooting. The two then ran together, with the nonshooter appearing to be on his phone.

During his interrogation, the nonshooter repeatedly asked what his charges were and about his mom and family, and said he did not know what to say. The shooter said no weapons were drawn by the victims and it was over words. Two people matching the two gang members were seen dumping a gun in the bushes and the one matching the nonshooter's description was heard saying, "Drop it, let's go." The two had also been in contact many times before on the night of the shooting and the nonshooter had a photo of the shooter as his phone's screensaver.

The four rival Sureños cooperated with police on the night of the shooting, but subsequently "forget everything" and refuse to cooperate.

Based on this hypothetical, Flaws testified that the act promoted or benefitted the Norteño gang and the individual members involved. He testified that because gangs thrive on fear and intimidation, committing a crime against rival gang members in a public place like a mall while wearing gang colors "is making a very bold statement." Gang members know that wearing their colors in public risks problems with other gang members or even law enforcement, and such an act instills fear and intimidation in rivals as well as the community and from fear comes power. Through instilling fear in the community, gangs can continue to operate and commit crime because community members do not want to cooperate with law enforcement or testify against the gang.

Flaws also testified that in his opinion, the act was at the direction of a criminal street gang. He stated that through Operation Street Sweeper, law enforcement learned that approximately 90 percent of the crimes committed were directed by the gang via telephone and if a group of Norteños who knew one another were at the same location at the same time wearing gang colors, were in communication by telephone and went to a direct location to commit a gang crime, that evidenced a crime at the direction of the gang.

Regarding the nonshooting gang member, Flaws testified that in Operation Street Sweeper, someone higher up in the gang would order individuals to commit a crime. A member would, for example, shoot someone or something while another member stood there with an open phone line both to report back and so that whomever ordered the crime could hear it happening. Thus, regarding the hypothetical, an individual wearing gang colors, going directly to the scene with the armed shooter, on the phone from beginning to end with another gang member he knew, and standing there during the shooting and "talking smack" indicated acting at the direction of the gang. Additionally, there is "strength in numbers" and all of these things show the individual is backing up and in "solidarity with" the shooter and standing with the gang.

Flaws also testified the hypothetical act was in association with a criminal street gang because again, the individuals were all members of the same Norteño gang who knew one another, they were associating together in one location while wearing gang colors, gang slurs were exchanged and a gang crime was committed.

Finally, Flaws testified that the hypothetical act promoted, furthered or assisted gang members in criminal conduct because the brazenness of the act instilled intimidation, which further promoted the gang. Gangs fight and the more successful they are, the better they look, which helps their ability to recruit members, as people want to join successful gangs rather than ones getting up beat up and shot at all the time.

### 2. Second Hypothetical

Next, the prosecutor asked Flaws to consider the same hypothetical with the two gang members going to the mall wearing gang colors and acting as they did, but without the third gang member's presence there or involvement, without any communication between the three, without an open phone line and without considering any previous contacts with the third gang member. Flaws testified that the omission of the facts involving the third gang member and open phone line would not cause him to change his opinion because the hypothetical still involved use of gang slurs and two active Norteños wearing their gang colors to the mall while armed, confronting gang rivals together, and remaining together during the shooting and their flight from the scene. Regarding the nonshooting gang member's involvement, the two walked past the business together and then returned, knowing a confrontation would likely result with the four Sureños. Flaws testified that for the same reasons he articulated in response to the first hypothetical, the scenario in the second hypothetical promoted and benefitted the gang, was in association with or for the benefit of a criminal street gang, and promoted, furthered or assisted in criminal conduct.

## II. Defense Case

Esquer testified at trial. He said he had been shot in 2009 and, subsequently, sometimes carried a gun in public for protection, but prior to January 27, 2012, he had never pulled a gun on anyone. On January 27, 2012, he was hanging out with Hanson at the house of someone he reluctantly identified on cross-examination as "Priscilla." During that time, he communicated some with Nanez, whom he had known for several years. He and Hanson walked to the mall sometime after 6:30 p.m. to "see the girls" and "just go." When they arrived, he recognized people he knew, including Nanez. He testified that when he saw Nanez, he just said, "What's up?" and went on his way. Esquer denied that Nanez told him he was needed at the mall or that Nanez or anyone else instructed him to commit a crime or act aggressively, but he admitted he later received a phone call from Nanez. He also denied that he and Hanson ever communicated about carrying out aggressive behavior at the mall.

Esquer knew Jose S. from school, but denied having any problems with him. He did not know the other three men. He testified all of them were wearing blue and they were in front of the candy store when he walked past. From behind him, he heard someone call him a "buster" and a "chapete," which are "bad word[s]" for someone associated with the Norteños. He turned around. Jose S. moved closer to him and said, "South Side Kings." He also said, "Let's go outside, puto." Esquer responded, "Fuck you." Felipe, who had a sweater draped over his arm, at some point said, "Loco Park," which is a Sureño gang.

Esquer testified he made one comment to them; he denied saying he wanted to fight or asking, "You want some of this?" He also denied intending to go into the store and said he instead intended to walk around the men. As Jose S. was saying, "Let's go outside," Miguel was reaching into his back pocket and Felipe's hand was moving underneath his sweater. Although Esquer could not see any weapons, he got scared they were going to assault him and he pulled his gun out to protect himself and Hanson. He denied intending to shoot at the cashier or at anyone, denied entering the store and denied pursuing any of them. He testified he just wanted "to get these guys away from [him] so they wouldn't harm [him]." He said he was shooting at them because they were posing a threat to him, but he was not aiming at any individual and he did not intend to kill anyone. He testified he did not receive any instructions from Hanson, they did not have a plan upon arrival at the candy store and Hanson did not know he had a firearm.

14

Regarding his Norteño associated tattoos, Esquer testified he did not get permission from the Norteño gang to get his "GK" tattoo, and he did not "earn" it. He explained he got the tattoo because the Oriental Troop killed one of his friends and he "buil[t] hate towards them." He denied having ever sought vengeance for the killing and he denied ever having been involved in a crime of violence. Esquer testified he was a "dropout" and not housed in a gang unit at the jail. He stated he hung out with friends from school and his neighborhood, but did not involve himself in gang-related crimes and said, "I got tattoos, but it's my own decision, my own choice."

On cross-examination, Esquer testified he put the gun in the waistband of his pants when he left his house that afternoon. He said he kept it in his pants while he was at Priscilla's house and he took it for protection against anyone who tried to harm him. He admitted that he hung out with gang members, and that gang members cause problems for other gang members. He also admitted he had a red bandana hanging out of his pocket and Hanson had one around his neck, which symbolized the Norteño gang.

Esquer testified when he spoke to Nanez earlier in the day and then five or ten minutes before the shooting, they were discussing what they were going to do later and he did not know Nanez was going to the mall.

Esquer testified he was shooting at all the people in the candy store and he shot at someone running away toward Hollister.

Esquer denied Hanson was on the phone when they were running following the shooting. He testified they parted company after they exited the mall and he threw the gun by In–N–Out Burger. Afterward they only spoke on the phone to confirm each made it home. Esquer testified he did not remember talking to Nanez after the shooting.

Esquer, 2017 WL 1315678, at *2–14 (footnotes in original).

### III.

### STANDARD OF REVIEW

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws or treaties of the United States. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375 (2000). Petitioner asserts that he suffered violations of his rights as guaranteed by the U.S. Constitution. The challenged convictions arise out of the Tulare County Superior Court, which is located within the Eastern District of California. 28 U.S.C. § 2241(d).

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment. Lindh v. Murphy, 521 U.S. 320 (1997); Jeffries v. Wood, 114 F.3d 1484, 1499 (9th

15

Cir. 1997) (en banc). The instant petition was filed after the enactment of AEDPA and is therefore governed by its provisions.

Under AEDPA, relitigation of any claim adjudicated on the merits in state court is barred unless a petitioner can show that the state court's adjudication of his claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); Harrington v. Richter, 562 U.S. 86, 97–98 (2011); Lockyer v. Andrade, 538 U.S. 63, 70–71 (2003); Williams, 529 U.S. at 413.

As a threshold matter, this Court must "first decide what constitutes 'clearly established Federal law, as determined by the Supreme Court of the United States.'" Lockyer, 538 U.S. at 71 (quoting 28 U.S.C. § 2254(d)(1)). In ascertaining what is "clearly established Federal law," this Court must look to the "holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision." Williams, 529 U.S. at 412. "In other words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." Id. In addition, the Supreme Court decision must "'squarely address [] the issue in th[e] case' or establish a legal principle that 'clearly extend[s]' to a new context to the extent required by the Supreme Court in . . . recent decisions"; otherwise, there is no clearly established Federal law for purposes of review under AEDPA. Moses v. Payne, 555 F.3d 742, 754 (9th Cir. 2009) (quoting Wright v. Van Patten, 552 U.S. 120, 125 (2008)); Panetti v. Quarterman, 551 U.S. 930 (2007); Carey v. Musladin, 549 U.S. 70 (2006). If no clearly established Federal law exists, the inquiry is at an end and the Court must defer to the state court's decision. Musladin, 549 U.S. 70; Wright, 552 U.S. at 126; Moses, 555 F.3d at 760.

If the Court determines there is governing clearly established federal law, the Court must then consider whether the state court's decision was "contrary to, or involved an unreasonable application of, [the] clearly established Federal law." Lockyer, 538 U.S. at 72 (quoting 28 U.S.C.

§ 2254(d)(1)). "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." <u>Williams</u>, 529 U.S. at 412–13; <u>see also</u> <u>Lockyer</u>, 538 U.S. at 72. "The word 'contrary' is commonly understood to mean 'diametrically different,' 'opposite in character or nature,' or 'mutually opposed.'" <u>Williams</u>, 529 U.S. at 405 (quoting Webster's Third New International Dictionary 495 (1976)). "A state-court decision will certainly be contrary to [Supreme Court] clearly established precedent if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases." <u>Id.</u> If the state court decision is "contrary to" clearly established Supreme Court precedent, the state decision is reviewed under the pre-AEDPA de novo standard. <u>Frantz v. Hazey</u>, 533 F.3d 724, 735 (9th Cir. 2008) (en banc).

"Under the 'reasonable application clause,' a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." <u>Williams</u>, 529 U.S. at 413. "[A] federal court may not issue the writ simply because the court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." <u>Id.</u> at 411; <u>see also</u> <u>Lockyer</u>, 538 U.S. at 75–76. The writ may issue only "where there is no possibility fair minded jurists could disagree that the state court's decision conflicts with [the Supreme Court's] precedents." <u>Richter</u>, 562 U.S. at 102. In other words, so long as fair minded jurists could disagree on the correctness of the state court's decision, the decision cannot be considered unreasonable. <u>Id.</u> If the Court determines that the state court decision is objectively unreasonable, and the error is not structural, habeas relief is nonetheless unavailable unless the error had a substantial and injurious effect on the verdict. <u>Brecht v. Abrahamson</u>, 507 U.S. 619, 637 (1993).

The court looks to the last reasoned state court decision as the basis for the state court judgment. <u>Stanley v. Cullen</u>, 633 F.3d 852, 859 (9th Cir. 2011); <u>Robinson v. Ignacio</u>, 360 F.3d 1044, 1055 (9th Cir. 2004). If the last reasoned state court decision adopts or substantially incorporates the reasoning from a previous state court decision, this court may consider both

decisions to ascertain the reasoning of the last decision. Edwards v. Lamarque, 475 F.3d 1121, 1126 (9th Cir. 2007) (en banc). "When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." Richter, 562 U.S. at 99. This presumption may be overcome by a showing "there is reason to think some other explanation for the state court's decision is more likely." Id. at 99–100 (citing Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991)).

Where the state court reaches a decision on the merits but provides no reasoning to support its conclusion, a federal habeas court independently reviews the record to determine whether habeas corpus relief is available under § 2254(d). Stanley, 633 F.3d at 860; Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003). "Independent review of the record is not de novo review of the constitutional issue, but rather, the only method by which we can determine whether a silent state court decision is objectively unreasonable." Himes, 336 F.3d at 853. While the federal court cannot analyze just what the state court did when it issued a summary denial, the federal court must review the state court record to determine whether there was any "reasonable basis for the state court to deny relief." Richter, 562 U.S. at 98. This Court "must determine what arguments or theories ... could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court." Id. at 102.

## IV.

### REVIEW OF CLAIMS

#### A. Contrived Self-Defense Instruction

In his first claim for relief, Petitioner asserts that the trial court erred in giving the jury a contrived self-defense instruction. Petitioner contends that the instruction erroneously established as a matter of law that Petitioner was not entitled to imperfect self-defense if Petitioner contrived to use any force, including nondeadly force. (ECF No. 1 at 5, 41).[23] Respondent argues that Petitioner failed to exhaust the instructional error claim by not fairly presenting it to the

---

[23] Page numbers refer to ECF page numbers stamped at the top of the page.

California Supreme Court and that the claim is now procedurally defaulted. (ECF No. 17 at 35–36). Respondent further argues that the intermediate state court's rejection of the claim was neither contrary to nor an unreasonable application of Supreme Court authority. (ECF No. 17 at 35).

### 1. Exhaustion and Procedural Default

Petitioner raised this instructional error claim on direct appeal to the California Court of Appeal, Fifth Appellate District, which denied the claim in a reasoned decision. Petitioner did not raise the instructional error claim in his petitions for review and did not join in codefendant Hanson's presentation of the claim in Hanson's petition for review. (LDs 11, 12).

A petitioner in state custody who is proceeding with a petition for writ of habeas corpus must exhaust state judicial remedies. 28 U.S.C. § 2254(b)(1). The exhaustion doctrine is based on comity to the state court and gives the state court the initial opportunity to correct the state's alleged constitutional deprivations. Coleman v. Thompson, 501 U.S. 722, 731 (1991); Rose v. Lundy, 455 U.S. 509, 518 (1982). A petitioner can satisfy the exhaustion requirement by providing the highest state court with a full and fair opportunity to consider each claim before presenting it to the federal court. O'Sullivan v. Boerckel, 526 U.S. 838, 845 (1999); Duncan v. Henry, 513 U.S. 364, 365 (1995); Picard v. Connor, 404 U.S. 270, 276 (1971).

A federal court also will not review a petitioner's claims if the state court has denied relief on those claims pursuant to a state law procedural ground that is independent of federal law and adequate to support the judgment. Coleman v. Thompson, 501 U.S. 722, 729–30 (1991). This doctrine of procedural default is based on the concerns of comity and federalism. Id. at 730–32. However, there are limitations as to when a federal court should invoke procedural default and refuse to review a claim because a petitioner violated a state's procedural rules. Procedural default can only block a claim in federal court if the state court "clearly and expressly states that its judgment rests on a state procedural bar." Harris v. Reed, 489 U.S. 255, 263 (1989).

Exhaustion and procedural default are closely related doctrines. Because the exhaustion requirement "'refers only to remedies still available at the time of the federal petition,' it is satisfied 'if it is clear that [the habeas petitioner's] claims are now procedurally barred under

[state] law.'" Gray v. Netherland, 518 U.S. 152, 161 (1996) (alteration in original) (first quoting Engle v. Isaac, 456 U.S. 107, 125 n.28 (1982); then quoting Castille v. Peoples, 489 U.S. 346, 351 (1989)). "However, the procedural bar that gives rise to exhaustion provides an independent and adequate state-law ground for the conviction and sentence, and thus prevents federal habeas corpus review of the defaulted claim, unless the petitioner can demonstrate cause and prejudice for the default." Gray, 518 U.S. at 162.

Ordinarily procedural bar issues are resolved first, but courts have recognized that "[p]rocedural bar issues are not infrequently more complex than the merits issues . . . so it may well make sense in some instances to proceed to the merits if the result will be the same." Franklin v. Johnson, 290 F.3d 1223, 1232 (9th Cir. 2002) (citing Lambrix v. Singletary, 520 U.S. 518, 525 (1997)). Accordingly, the Court will proceed to review Petitioner's claim de novo. See Berghuis v. Thompkins, 560 U.S. 370, 390 (2010) ("Courts can . . . deny writs of habeas corpus under § 2254 by engaging in de novo review when it is unclear whether AEDPA deference applies, because a habeas petitioner will not be entitled to a writ of habeas corpus if his or her claim is rejected on de novo review . . . .").

2. Merits Analysis

In denying Petitioner's jury instruction claim, the California Court of Appeal stated:

Next, Esquer argues that although the trial court properly instructed the jury on self-defense and imperfect self-defense, it erred when it instructed on contrived self-defense pursuant to CALCRIM No. 3472, as the instruction erroneously "established as a matter of law that [he] was not entitled to imperfect self-defense ...." Hanson joins in this argument.

The People contend Esquer and Hanson forfeited this claim by failing to object in the trial court; the decision they rely on, *People v. Ramirez* (2015) 233 Cal.App.4th 940 (*Ramirez*), is inapposite; and any error was harmless.

**A. Forfeiture**
Trial counsel did not object to CALCRIM No. 3472, but Esquer and Hanson maintain they did not forfeit their right to challenge the instruction on appeal because it is an erroneous statement of law and the error affected their substantial rights. (*People v. Capistrano* (2014) 59 Cal.4th 830, 875, fn. 11; § 1259.) We find neither error nor prejudice assuming error and, therefore, we need not determine whether Esquer's and Hanson's failure to object resulted in forfeiture of the claim. (§ 1259; *People v. Johnson* (2016) 62 Cal.4th 600, 638–639; *People v. Lucas* (2014) 60 Cal.4th 153, 281, fn. 47, disapproved on another ground in *People v. Romero and Self* (2015) 62 Cal.4th 1, 53, fn. 19.)

**B. Standard of Review**

We review allegations of instructional error de novo. (*People v. Waidla* (2000) 22 Cal.4th 690, 733; *People v. Martin* (2000) 78 Cal.App.4th 1107, 1111.) "[I]nstructions are not considered in isolation. Whether instructions are correct and adequate is determined by consideration of the entire charge to the jury." (*People v. Holt* (1997) 15 Cal.4th 619, 677; *People v. Thomas* (2011) 52 Cal.4th 336, 356.) "If the charge as a whole is ambiguous, the question is whether there is a " 'reasonable likelihood that the jury has applied the challenged instruction in a way" that violates the Constitution.' " (*Middleton v. McNeil* (2004) 541 U.S. 433, 437 (*per curiam*).) Jurors are presumed to have understood and followed the trial court's jury instructions. (*People v. Sandoval* (2015) 62 Cal.4th 394, 422.)

**C. Contrived Self-defense Instruction**

CALCRIM No. 3472, which addresses contrived self-defense, provides: "A person does not have the right to self-defense if he provokes a fight or quarrel with the intent to create an excuse to use force." Esquer and Hanson rely on the decision in *Ramirez* to support their argument that CALCRIM No. 3472 is an incorrect statement of law and it erroneously foreclosed them from relying on imperfect self-defense. We find *Ramirez* readily distinguishable, however.

In *Ramirez*, a divided Court of Appeal held the trial court erred in instructing the jury with CALCRIM No. 3472. (*Ramirez, supra*, 233 Cal.App.4th at p. 943.) While acknowledging the instruction was a correct "rule of law in appropriate circumstances" (*id.* at p. 947), the court held the instruction misstated the law, explaining that "[t]he instructions and the prosecutor's argument established as a matter of law that defendants were not entitled to imperfect self-defense if they contrived to use *any* force, even nondeadly force, but that was a question for the jury to decide on its own evaluation of the facts" (*id.* at p. 953).

The decision in *Ramirez* was recently addressed in *People v. Eulian* (2016) 247 Cal.App.4th 1324 (*Eulian*). The Court of Appeal in *Eulian* considered and rejected the argument Esquer and Hanson advance, on the grounds that "the California Supreme Court has held that the instruction is a correct statement of law; [the] defendant overstates the holding of *Ramirez*; the instruction was proper under the facts of this case; and [the] defendant has not established prejudice." (*Id.* at p. 1332.) The court disagreed with the *Ramirez* decision and concluded that "CALCRIM No. 3472 is generally a correct statement of law, which might require modification in the rare case in which a defendant intended to provoke only a nondeadly confrontation and the victim responds with deadly force." (*Eulian, supra*, at p. 1334.)

On the facts of this case, we agree with the court in *Eulian*. In *People v. Enraca* (2012) 53 Cal.4th 735, 761, the trial court had instructed the jury on contrived self-defense pursuant to CALJIC No. 5.55.[24] Although the instruction was subsequently revised in 2015 to reflect the decision in *Ramirez*, the California Supreme Court rejected the defendant's instructional challenge to the prerevision version, signaling its approval of the instruction as an accurate statement of the law and finding the instruction was "clearly supported by the record."[25] (*People v.*

---

[24] CALJIC No. 5.55, which is analogous to CALCRIM No. 3472, provided: "The right of self-defense is not available to a person who seeks a quarrel with the intent to create a real or apparent necessity of exercising self-defense."

[25] The following paragraph was added to CALJIC No. 5.55: "[However, a person who contrives to start a fistfight or provoke a nondeadly quarrel does not forfeit the right to self-defense if [his] [her] opponent[s] respond[s] in a

*Enraca, supra*, at pp. 761–762; see *Eulian, supra*, 247 Cal.App.4th at p. 1333.) Thus, Esquer's and Hanson's argument that CALCRIM No. 3472 misstates the law overreaches.

Moreover, this case does not present the same circumstances found in *Ramirez*, which concerned two brothers convicted of first degree murder in the shooting death of a rival gang member. (*Ramirez, supra*, 233 Cal.App.4th at pp. 943–945.) The brothers, along with a third member of their gang, drove to an apartment complex to look for a specific rival gang member with whom they had a personal connection and who had intervened in the past to stop his gang's harassment of them. (*Id.* at p. 944.) There they encountered six or seven other members of the rival gang, and a fight ensued during which one of the brothers pulled out a gun and fatally shot one of the rival gang members. (*Id.* at pp. 944–945.)

There was some testimony that the defendants in *Ramirez* were the initial aggressors, but there was also evidence that they "asked to no avail for Mario, and that a [rival] gang member may have thrown the first punch." (*Ramirez, supra*, 233 Cal.App.4th at p. 944.) At trial, the brother who shot the victim testified he did not go there intending to shoot anyone; that when the fight broke out, he, his brother and his friend were "double-teamed"; he saw the victim approach and raise his hand, holding something black that looked like a gun; and he shot the victim in self-defense and in the defense of his companions. (*Id.* at pp. 944–945.)

The trial court instructed the jury on contrived self-defense and the prosecutor argued, repeatedly and emphatically, that under no circumstance could the defendants claim self-defense if they intended to provoke the fight and used force. (*Ramirez, supra*, 233 Cal.App.4th at pp. 945–947.) On appeal, the defendants argued the instruction and the prosecutor's arguments prevented the jury from considering their self-defense claim. (*Id.* at p. 945.) The Court of Appeal concluded that, as compounded by the prosecutor's repeated arguments, the instruction erroneously foreclosed the defendants' claims of imperfect self-defense, requiring reversal. (*Ibid.*)

Here, there is no evidence that anyone pulled a weapon on Esquer and Hanson, that anyone other than Esquer was armed with a gun, or that Esquer saw or thought he saw a weapon in anyone's hands. While Esquer claims on appeal he saw what he thought was a weapon, we do not find support for that argument in the record. In his statement to police, Esquer said no one pulled a weapon and the shooting occurred over words, despite Detective Fahoum's inquiry about whether self-defense was an issue. In his trial testimony, he said he pulled out his gun and fired because Miguel A. was reaching in his back pocket and Felipe A.'s hand was moving under his sweater, causing him to feel threatened and fear an assault.

As well, the prosecutor in this case did not take the court's instruction on contrived self-defense and repeatedly hammer at the jury with it, forcing the jury "to conclude that in contriving to use force, even to provoke only a fistfight, [the] defendants entirely forfeited any right to self-defense." (*Ramirez, supra*, 233 Cal.App.4th at p. 953.) To the contrary, the prosecutor here did not focus on the issue of contrived self-defense or the jury instruction.[26]

---

sudden and deadly counterassault, that is, force that is excessive under the circumstance. The party victimized by the excessive force need not withdraw and may use reasonable necessary force in lawful self-defense.]"

[26] The prosecutor touched only briefly on the claim of self-defense. After also only briefly addressing provocation and heat of passion, she stated, "And the other one, the self-defense one, it's just not there. I mean, you can look at the instructions, but then again, yes, he took the stand and said that now. Back then on that night, he was like, nope,

For these reasons, we conclude that to the extent CALCRIM No. 3472 requires modification in some circumstances (*Eulian, supra*, 247 Cal.App.4th at p. 1334), those circumstances are not presented by this case, and we find Esquer's and Hanson's arguments that the instruction "effectively and erroneously prevented the jury from considering" their claims of self-defense and imperfect self-defense unpersuasive.

**D. No Prejudice**

In addition, even if we assume error, there was no prejudice under state or federal law. (See *Eulian, supra*, 247 Cal.App.4th at p. 1335 [no prejudice under state or federal standard]; *Ramirez, supra*, 233 Cal. App.4th at p. 953 [error prejudicial under federal standard]; *People v. Vasquez* (2006) 136 Cal.App.4th 1176, 1180 [error prejudicial under state standard].) The crimes were captured by the mall's video surveillance cameras and there were multiple witnesses to the shooting. The jury also listened to Esquer's recorded statement and he testified at trial. There was no evidence anyone in the candy store pulled out a weapon, Esquer did not claim he saw a weapon and, although he testified he was not trying to hit anyone, he admitted that he was shooting at all the people in the candy store and that he shot at someone running away past Hollister. Further, the trial court properly instructed the jury on self-defense and imperfect self-defense; it instructed the jury on the right to self-defense in mutual combat situations;[27] and the prosecutor did not emphasize the contrived self-defense instruction and did not, expressly or impliedly, argue that if Esquer and Hanson were the initial aggressors, they were categorically barred from claiming self-defense. Under these circumstances, any error on the contrived self-defense instruction was merely technical and harmless beyond a reasonable doubt.

*Esquer*, 2017 WL 1315678, at *20–22 (footnotes in original).

"[T]he fact that an instruction was allegedly incorrect under state law is not a basis for [federal] habeas relief." Estelle v. McGuire, 502 U.S. 62, 71–72 (1991). A federal court's inquiry on habeas review is not whether a challenged jury instruction "is undesirable, erroneous, or even 'universally condemned,' but [whether] it violated some right which was guaranteed to the defendant by the Fourteenth Amendment." Cupp v. Naughten, 414 U.S. 141, 146 (1973). "In a criminal trial, the State must prove every element of the offense, and a jury instruction violates due process if it fails to give effect to that requirement." Middleton v. McNeil, 541 U.S. 433, 437

---

they called me names. Yes, they do absolutely look like they have somewhere to go, these two when they walk in the mall."

[27] Pursuant to CALCRIM No. 3471, the court instructed: "A person who engages in mutual combat has a right to self-defense only if, one, he actually and [in] good faith tried to stop fighting; two, he indicated by word or conduct to his opponent in a way that a reasonable person would understand that he wanted to stop fighting and that he had stopped fighting.

"If the defendant meets these requirements, he then has a right of self-defense if the opponent continued to fight. However, if he used only nondeadly force, then the opponent responding with such sudden and deadly force that the defendant could not withdraw from the fight, then the defendant had the right to defend himself with deadly force and was not required to stop fighting, communicate the desire to stop [to] the opponent, or give the opponent a chance to stop fighting."

(2004). However, "not every ambiguity, inconsistency, or deficiency in a jury instruction rises to the level of a due process violation." Id. The pertinent question is "whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process." Estelle, 502 U.S. at 72 (internal quotation marks omitted) (quoting Cupp, 414 U.S. at 147).

"It is well established that the instruction 'may not be judged in artificial isolation,' but must be considered in the context of the instructions as a whole and the trial record." Estelle, 502 U.S. at 72 (quoting Cupp, 414 U.S. at 147). With respect to contrived self-defense, the trial court instructed that "a person does not have the right to self-defense if he provokes a fight or quarrel with the intent to create an excuse to use force." (6 RT[28] 968; 3 CT 625). The jury also was instructed on self-defense, imperfect self-defense,[29] and the right to self-defense in mutual combat or initial aggressor situations. (6 RT 964–68; 3 CT 621–24). Petitioner does not argue that these instructions were improper or erroneous. The prosecutor only fleetingly mentioned self-defense and did not specifically address contrived self-defense during her closing argument.[30] (6 RT 1060). In contrast, defense counsel specifically addressed imperfect self-defense and directed the jury's attention to the instruction. (6 RT 1022–23).

Moreover, the evidence presented at trial militates against finding that the contrived self-defense instruction "by itself so infected the entire trial that the resulting conviction violates due process." Estelle, 502 U.S. at 72. The offense was recorded by the mall's video surveillance cameras, and there were multiple witnesses to the offense. Although Jose A. and Felipe A. had knives on their persons, there was no evidence presented at trial that Jose A., Felipe A., or anyone in the candy store pulled a weapon on Petitioner and Hanson or that anyone other than

---

[28] "RT" refers to the Reporter's Transcript on Appeal lodged by Respondent on February 27, 2018. (ECF No. 19).
[29] Pursuant to CALCRIM No. 604, the court instructed the jury as follows:

> The defendant acted in imperfect self-defense or imperfect defense of another if, one, the defendant took at least one direct but ineffective step toward killing a person; two, the defendant intended to kill when he acted; three, the defendant believed that he or Anthony Hanson was in imminent danger of being killed or suffering great bodily injury; four, the defendant believed that the immediate use of deadly force was necessary to defend against the danger, but five, at least one of the defendants' belief was unreasonable.

(6 RT 964)
[30] The prosecutor's reference to self-defense occurred during her rebuttal closing and consisted of seven lines. The prosecutor's entire closing argument consisted of approximately forty pages of transcript. (6 RT 975–1007, 1055–62).

Petitioner was armed with a firearm. (3 RT 273–75, 343; 4 RT 404–07, 422–28, 452–54, 480–84, 500–01; Supp. CT[31] 19–20). In an interview after the incident, Detective Fahoum informed Petitioner that "if those guys did something to provoke you and they're lying to us and they're saying it was all you, I'd like to know." (Supp. CT 31). Although Detective Fahoum specifically mentioned self-defense, Petitioner stated that the incident occurred due to a verbal argument and denied seeing anyone pull out a weapon. (Supp. CT 31–34). However, at trial, Petitioner testified that he pulled out his gun and fired to protect himself because Miguel reached behind his back and Felipe reached under his sweater, which caused Petitioner to feel scared and fear an assault. (5 RT 865–67). Although Petitioner testified he was not trying to hit anyone, he admitted that he was shooting at all the people in the candy store and that he shot at someone running away from Petitioner past Hollister. (5 RT 866–68, 897).

"[C]onsidered in the context of the instructions as a whole and the trial record," the Court does not find that the contrived self-defense instruction "by itself so infected the entire trial that the resulting conviction violates due process." Estelle, 502 U.S. at 72. Accordingly, Petitioner is not entitled to habeas relief on his first claim, and it should be denied.

**B. Admission of Hearsay Evidence**

In his second claim for relief, Petitioner asserts that the gang expert relied on inadmissible hearsay statements in framing his opinion testimony. With respect to facts in support of this claim, the petition directs the Court to Petitioner's opening appellate brief and supplemental letter brief that were submitted to the California Court of Appeal. (ECF No. 1 at 7). On direct appeal to the California Court of Appeal, Petitioner argued that: (1) Officer Flaws's reliance on Nathan Hiser's out-of-court statement as a basis for his expert opinion violated the Sixth Amendment's Confrontation Clause; and (2) Officer Flaws's testimony regarding Petitioner's police contacts was inadmissible. (ECF No. 1 at 60, 81). The California Court of Appeal denied the claims in a reasoned decision. In his petition for review, however, Petitioner only challenged the Court of Appeal's determination with respect to the admission of the police

---

[31] "Supp. CT" refers to the Supplemental Clerk's Transcript on Appeal lodged by Respondent on February 27, 2018. (ECF No. 19).

contacts. (LD 11). The California Supreme Court summarily denied Petitioner's petition for review. Respondent argues that the state court's denial of the claim was not contrary to or an unreasonable application of Chapman. (ECF No. 11 at 42).

As federal courts review the last reasoned state court opinion, the Court will "look through" the California Supreme Court's summary denial and examine the decision of the California Court of Appeal regarding the admission of Officer Flaws's police contacts testimony. See Brumfield, 135 S. Ct. at 2276; Ylst, 501 U.S. at 806. In denying the claim, the California Court of Appeal stated:

**B. Background**

"In 1988, the Legislature enacted the California Street Terrorism Enforcement and Prevention Act (the STEP Act). (§ 186.20 et seq.) 'The impetus behind the STEP Act ... was the Legislature's recognition that "California is in a state of crisis which has been caused by violent street gangs whose members threaten, terrorize, and commit a multitude of crimes against the peaceful citizens of their neighborhoods. These activities, both individually and collectively, present a clear and present danger to the public order and safety and are not constitutionally protected." (§ 186.21.)' [Citation.]

"As relevant here, the STEP Act prescribes increased punishment for a felony if it was related to a criminal street gang. (§ 186.22, subd. (b)(1).) '[T]o subject a defendant to the penal consequences of the STEP Act, the prosecution must prove that the crime for which the defendant was convicted had been "committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members." (§ 186.22, subd. (b)(1) ....) In addition, the prosecution must prove that the gang (1) is an ongoing association of three or more persons with a common name or common identifying sign or symbol; (2) has as one of its primary activities the commission of one or more of the criminal acts enumerated in the statute; and (3) includes members who either individually or collectively have engaged in a "pattern of criminal gang activity" by committing, attempting to commit, or soliciting *two or more* of the enumerated offenses (the so-called "predicate offenses") during the statutorily defined period. (§ 186.22, subds. (e) and (f).)' [Citation.]" (*People v. Hernandez* (2004) 33 Cal.4th 1040, 1047, fn. omitted; accord, *Sanchez, supra*, 63 Cal.4th at p. 698.)

It is not a crime to be a gang member (*People v. Elizalde* (2015) 61 Cal.4th 523, 539; *People v. Rodriguez* (2012) 55 Cal.4th 1125, 1130), and "[n]ot every crime committed by gang members is related to a gang" (*People v. Albillar* (2010) 51 Cal.4th 47, 60). Nevertheless, while gang membership is not an element of the enhancement, gang evidence can bolster the prosecution's theory on the elements it is required to prove. (*Sanchez, supra*, 63 Cal.4th at pp. 698–699; *People v. Gutierrez* (2009) 45 Cal.4th 789, 820; *People v. Hernandez, supra*, 33 Cal.4th at p. 1049.)

## C. Flaws's Testimony

### 1. Error

Following the decision in *Sanchez*, "[w]hen any expert relates to the jury case-specific out-of-court statements, and treats the content of those statements as true and accurate to support the expert's opinion, the statements are hearsay." (*Sanchez, supra*, 63 Cal.4th at p. 686.) "If the case is one in which a prosecution expert seeks to relate *testimonial* hearsay, there is a confrontation clause violation unless (1) there is a showing of unavailability and (2) the defendant had a prior opportunity for cross-examination, or forfeited that right by wrongdoing." (*Ibid.*)

Thus, "a court addressing the admissibility of out-of-court statements must engage in a two-step analysis. The first step is a traditional hearsay inquiry: Is the statement one made out of court; is it offered to prove the truth of the facts it asserts; and does it fall under a hearsay exception? If a hearsay statement is being offered by the prosecution in a criminal case, and the *Crawford* limitations of unavailability, as well as cross-examination or forfeiture, are not satisfied, a second analytical step is required. Admission of such a statement violates the right to confrontation if the statement is *testimonial hearsay*, as the high court defines that term." (*Sanchez, supra*, 63 Cal.4th at p. 680.)

The court discussed at length what constitutes testimonial hearsay in *Sanchez*, explaining, "Testimonial statements are those made primarily to memorialize facts relating to past criminal activity, which could be used like trial testimony. Nontestimonial statements are those whose primary purpose is to deal with an ongoing emergency or some other purpose unrelated to preserving facts for later use at trial." (*Sanchez, supra*, 63 Cal.4th at pp. 689, fn. omitted, 691–694.) Additionally, the formality of the statement is considered. (*Id.* at pp. 692–694; *People v. Ochoa* (2017) 7 Cal.App.5th 575, 583–584 (*Ochoa*).)

. . .

However, viewed now through the lens of *Sanchez*, it is clear that Flaws relied on inadmissible hearsay during other portions of his testimony. Of the hearsay admitted in violation of state law, some was also testimonial and, therefore, violated the confrontation clause.[32] The remainder, as we shall explain, may or may not have been testimonial, but the record does not allow for a determination. (*Ochoa, supra*, 7 Cal.App.5th at p. 586.)

As we summarized, Flaws testified regarding approximately 30 police contacts, 18 relating to Hanson and 12 relating to Esquer. Of those contacts, all but two appear to be hearsay inadmissible under state law. (*Sanchez, supra*, 63 Cal.4th at pp. 680, 686.)

Concerning Esquer, Flaws testified about an April 2011 probation contact involving Officer Peña. Because Peña testified at trial regarding that contact and was subject to cross-examination, Flaws was entitled to rely on it in forming his opinion. (*Sanchez, supra*, 63 Cal.4th at p. 684; *People v. Burroughs, supra*, 6 Cal.App.5th at p. 403.) Concerning Hanson, Flaws was personally involved in one of the contacts during which Hanson admitted he was a Norteño and wore gang colors in the form of a red bandana. Flaws was entitled to rely on that contact as well. (Evid. Code, §§ 702, 1220; *Meraz, supra*, 6 Cal.App.5th at p. 1176].) The

---

[32] Unavailability and cross-examination or forfeiture are not issues advanced by the parties. (*Sanchez, supra*, 63 Cal.4th at p. 680.)

remaining contacts involved other officers who either did not testify at trial or did not address the contacts in their testimony and, therefore, Flaws's testimony regarding those contacts was based on inadmissible hearsay following *Sanchez*.[33]

Of the contacts that were based on inadmissible hearsay, the record permits us to glean that some involved arrests, and two involved a traffic stop and a vehicle pursuit. We find the record is minimally sufficient for us to conclude that those contacts were criminal in nature and as the People mount no argument to the contrary, we assume they would constitute testimonial hearsay. (*Sanchez, supra*, 63 Cal.4th at pp. 694–698; *Meraz, supra*, 6 Cal.App.5th at p. 1176.) However, Flaws testified that he had "various" contacts with gang members while on patrol, some "custod[ial]" and some "friendly," and the bases for some of the contacts he described in his testimony are not in the record. We cannot simply assume that all contacts with law enforcement are testimonial and because Esquer and Hanson failed to object at trial, the record is undeveloped on this point. (*Sanchez, supra*, 63 Cal.4th at pp. 694–698; *Ochoa, supra*, 7 Cal.App.5th at p. 584.) On appeal, Esquer and Hanson bear the burden of affirmatively demonstrating error (*People v. Gamache* (2010) 48 Cal.4th 347, 378; *People v. White Eagle* (1996) 48 Cal.App.4th 1511, 1523 *People v. Clifton* (1969) 270 Cal.App.2d 860, 862), and we find that burden unmet with respect to the majority of the contacts described by Flaws (*Sanchez, supra*, 63 Cal.4th at p. 697; *Ochoa, supra*, at pp. 584–585). Because we must address the errors under the constitutional standard, however, any further parsing of the issue is unnecessary. (See *Sanchez, supra*, 63 Cal.4th at pp. 697–698.)

### 2. Prejudice

We evaluate the cumulative effect of these errors under *Chapman*, which requires the People to prove the errors were harmless beyond a reasonable doubt; that is, that the error did not contribute to the jury's verdict. (*People v. Houston* (2012) 54 Cal.4th 1186, 1233; *People v. Woods* (2006) 146 Cal.App.4th 106, 117; see *People v. Hill* (1998) 17 Cal.4th 800, 845; *Sanchez, supra*, 63 Cal.4th at p. 699; *People v. Leon* (2016) 243 Cal.App.4th 1003, 1020.) " 'To say that an error did not contribute to the ensuing verdict is ... to find that error unimportant in relation to everything else the jury considered on the issue in question, as revealed in the record.' [Citation.] Thus, the focus is what the jury actually decided and whether the error might have tainted its decision." (*People v. Neal* (2003) 31 Cal.4th 63, 86; *People v. Leon, supra*, at p. 1020.) We consider "not only the evidence that would support the judgment, but also the impact of the inadmissible evidence on the final outcome." (*People v. Gonzalez* (2012) 210 Cal.App.4th 875, 884.)

We are confronted here neither with a weak prosecution case that relied heavily on the inadmissible evidence (*Sanchez, supra*, 63 Cal.4th at p. 699; *People v. Stamps* (2016) 3 Cal.App.5th 988, 998) nor with a strong prosecution case with minimal inadmissible evidence (*Meraz, supra*, 6 Cal.App.5th at p. 1176). In this case, the admissible evidence supporting the gang enhancement was strong but Flaws's testimony regarding Esquer's and Hanson's contacts with police was based almost exclusively on inadmissible hearsay evidence.

---

[33] Detective Fahoum did not testify regarding the facts underlying the contact with which she was involved.

In addition to the April 2011 contact, Peña testified about two other contacts that occurred on September 30, 2011, and December 2, 2011. While those contacts were mentioned by Flaws in his testimony, he relied on specific facts to which Peña had not testified. Under *Sanchez*, Flaws's reliance on the information obtained during those contacts is permissible only to the extent Peña provided that information in his testimony. (*Sanchez, supra*, 63 Cal.4th at p. 684.)

Determining whether the error was prejudicial "requires an examination of the elements of the gang enhancement and the gang expert's specific testimony." (*Sanchez, supra*, 63 Cal.4th at p. 698.) Relevant here, the prosecution was required to prove Esquer and Hanson committed the crimes "[ (1),] for the benefit of, at the direction of, or in association with any criminal street gang, [and (2),] with the specific intent to promote, further, or assist in any criminal conduct by gang members." (§ 186.22, subd. (b).)

At the outset, we note that Esquer and Hanson overstate their positions in their supplemental briefs. Esquer argues that Flaws's testimony was the sole source of his gang-related conduct, and Hanson argues Flaws's testimony was the only evidence he was a Norteño. We find this not to be so.

The circumstances of the crime itself were striking. Hiser and Burris were active Norteño gang members, and they were at the mall together on January 27, 2012. Hiser was wearing gang colors. At one point prior to Esquer's and Hanson's arrival, they were in the same area in the mall as the four rival gang members and there were no other Sureño gang members at the mall at that time.

Esquer and Hanson had been hanging out together the day of the crime and were at a house only one street over from the mall. Esquer spoke with Nanez, an active Norteño, several times that day, including shortly before going to the mall. Esquer and Hanson were then seen on the surveillance video near the mall entrance with Nanez and an unidentified man. Esquer, Hanson and Nanez were all displaying red bandanas, their gang's color. Nanez was seen gesturing in a manner that indicated Esquer and Hanson would go one way while he and the unidentified man would go another way.

Esquer and Hanson proceeded directly to the candy store, where the four rival gang members were shopping. They were wearing blue, their gang's color, and Felipe A. had large gang tattoos on his forearms. Esquer and Hanson spotted them in the candy store and an altercation immediately ensued. An employee of the store testified Esquer picked the fight with the men inside and she told them to stop. Witnesses also testified to hearing gang slurs. Esquer then pulled a gun from his pants and started firing. Fewer than two minutes had passed since they entered the mall.

After the shooting, Esquer, Hanson and Nanez fled the mall, and Esquer ditched the gun under a bush, with Hanson urging him to leave it and go.

Flaws testified to the role cell phones play in the planning and commission of gang crimes, including the practice of keeping an open phone line, either to report back or so the listener is able to hear the crime being committed. In this case, there were numerous phone calls between Hanson and Nanez shortly before and after the crime, and some between Esquer and Nanez shortly before and after the crime. Further, both Nanez and Hanson were seen on the surveillance video with their phones to their ears, and Jose A. told Officer Jennings that Hanson was texting during the confrontation at the candy store.

During interrogation and at trial, Esquer denied being a Norteño gang member, but admitted he associated with them and said they had one another's backs. He also testified there are problems between gang members, and he armed himself because he hung out with gang members and risked encountering other gang members. He also said something that sounded like it was his "hit" during

interrogation, and he testified that he was classified in jail as being a gang dropout.

Flaws testified that when gang members "fly their colors," they are looking for trouble and, at trial, Esquer admitted the red bandana hanging out of his pocket at the time of the crime symbolized the group he hung out with: the Norteños. Esquer also had specific tattoos associated with the Norteño gang, which Flaws testified were generally earned. (*Sanchez, supra*, 63 Cal.4th at p. 677.) Esquer admitted at trial they were gang tattoos, but stated it was "[his] own decision, [his] own choice." In one particularly notable photograph, Esquer was displaying his gang-tattooed hands and flashing gang signs over the grave of a Norteño who was killed by a rival Oriental Troops gang member.

In addition to the April 2011 contact Peña and Flaws both addressed, Peña testified about a contact that occurred on December 2, 2011, following a call for service concerning the house of a known Norteño gang member. There were approximately eight Norteños in the house, including Esquer, Hanson and Nanez.

Hanson admitted during interrogation to having been in a gang his entire life and Fahoum, who met Hanson numerous times, testified he commonly wore a red bandana around his neck, as he was during the mall shootings. He also admitted to Flaws that he was a Norteño and he discarded a red bandana during that contact. Hanson, too, had specific tattoos associated with the Norteños, including the "G" and "K" tattoo on his hands and, on his phone, he had the photo of Esquer's "G" and "K" tattooed hands.

Finally, we note the jury's requests and questions did not pertain to Flaws's testimony or the gang enhancement allegations. They requested to see Esquer's interrogation video, with accompanying transcript, and the mall surveillance video; and they requested readback of Jennings's testimony regarding his interview of Jose A. and readback of Sylvia A.'s, Nicholas Myers's and Gabby Stepp's testimony.

After careful consideration, we reject not only Esquer's initial claim that Flaws's reference to Hiser's statement violated his rights under the Sixth Amendment, but also Esquer's and Hanson's claim that they suffered prejudice as a result of Flaws's reliance on hearsay evidence inadmissible under state and federal law following *Sanchez*. Although most of Flaws's testimony regarding Esquer's and Hanson's contacts with law enforcement relied on inadmissible hearsay, the prosecution's case was compelling even without this evidence.[34] We further observe that the admissions, gang associations and display of gang colors is cumulative in part of other admissible evidence. We therefore find the error resulting from the admission of the hearsay evidence of police contacts harmless beyond a reasonable doubt and we affirm the jury findings as to the gang enhancement.

Esquer, 2017 WL 1315678, at *14–19 (footnotes in original).

Here, the California Court of Appeal found that any error in admitting the contested testimony regarding Petitioner's prior police contacts was harmless beyond a reasonable doubt under the federal constitutional standard set forth in Chapman v. California, 386 U.S. 18 (1967).

---

[34] Esquer and Hanson do not claim the enhancement is unsupported by substantial evidence.

30

Under Chapman, "the test for determining whether a constitutional error is harmless . . . is whether it appears 'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'" Neder v. United States, 527 U.S. 1, 15 (1999) (quoting Chapman, 386 U.S. at 24). The Supreme Court has held that when a state court's "Chapman decision is reviewed under AEDPA, 'a federal court may not award habeas relief under § 2254 unless *the harmlessness determination itself* was unreasonable.'" Davis v. Ayala, 135 S. Ct. 2187, 2199 (2015) (quoting Fry v. Pliler, 551 U.S. 112, 119 (2007)). That is, Petitioner must show that the state court's harmless error determination "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility of fairminded disagreement." Ayala, 135 S. Ct. at 2199 (internal quotation marks omitted) (quoting Richter, 562 U.S. at 103).

Apart from the contested testimony regarding Petitioner's prior police contacts, the evidence admitted at trial credibly established the following: At the very least Petitioner associated with the Norteño gang and Norteño gang members. (5 RT 877, 908–11; Supp. CT 30). There was a long-standing rivalry between the Norteño and Sureños. (5 RT 719–21, 726). Gang members are looking for trouble when they "fly [their] colors," and shooting at a rival gang in a public place like a mall would benefit or further a gang by instilling fear in the community, which in turn "gives them power" and "allows them to continue to operate as a gang and commit crimes." (5 RT 782–83). There is a common gang practice of keeping an open phone line during the commission of a crime as a mode of reporting back so that whoever ordered the commission can hear what is happening. (5 RT 784–85). There were sixteen phone calls between Petitioner, Hanson, and Andy Nanez between 6:50 p.m. and 7:16 p.m. with Hanson calling Nanez eight times in a row between 6:52 p.m. and 7:00 p.m. (5 RT 681–84). The video surveillance footage showed Hanson had a cell phone to his ear as he was running after the shooting. (5 RT 598). Moreover, Officer Peña testified regarding his multiple personal contacts with Petitioner. (RT 704–09).

Based on the foregoing, the state court reasonably concluded that given the strength of the other evidence introduced at trial, the admission of some of Petitioner's prior contacts with

law enforcement (of which Officer Flaws did not have personal knowledge) was merely cumulative of other admissible gang-related evidence and did not prejudicially impact the jury's verdict. The California Court of Appeal's harmless error determination was not contrary to, or an unreasonable application of, Chapman, nor was it based on an unreasonable determination of fact. The decision was not "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility of fairminded disagreement." Richter, 562 U.S. at 103. Accordingly, Petitioner is not entitled to habeas relief on his second claim, and it should be denied.

### C. Ineffective Assistance of Counsel

In his third claim for relief, Petitioner asserts ineffective assistance of counsel for failure to request a pinpoint instruction that heat of passion can negate a defendant's ability to premeditate and deliberate. (ECF No. 1 at 8). Respondent argues that Petitioner failed to exhaust the ineffective assistance of counsel claim by not fairly presenting it to the California Supreme Court and that the claim is now procedurally defaulted. Respondent further argues that the intermediate state court's rejection of the claim was neither contrary to nor an unreasonable application of Supreme Court authority. (ECF No. 17 at 51–52).

#### 1. Exhaustion and Procedural Default

Petitioner raised this ineffective assistance of counsel claim on direct appeal to the California Court of Appeal, Fifth Appellate District, which denied the claim in a reasoned decision. Petitioner did not raise the ineffective assistance of counsel claim in his petitions for review and did not join in codefendant Hanson's presentation of the claim in Hanson's petition for review. (LDs 11, 12).

As set forth in section IV(A)(1), *supra*, a petitioner in state custody who is proceeding with a petition for writ of habeas corpus must exhaust state judicial remedies. 28 U.S.C. § 2254(b)(1). A petitioner can satisfy the exhaustion requirement by providing the highest state court with a full and fair opportunity to consider each claim before presenting it to the federal court. O'Sullivan, 526 U.S. at 845; Duncan, 513 U.S. at 365; Picard, 404 U.S. at 276. Additionally, a federal court will not review a petitioner's claims if the state court has denied

relief on those claims pursuant to a state law procedural ground that is independent of federal law and adequate to support the judgment. <u>Coleman</u>, 501 U.S. at 729–30. Procedural default can only block a claim in federal court if the state court "clearly and expressly states that its judgment rests on a state procedural bar." <u>Harris</u>, 489 U.S. at 263.

Exhaustion and procedural default are closely related doctrines. Because the exhaustion requirement "'refers only to remedies still available at the time of the federal petition,' it is satisfied 'if it is clear that [the habeas petitioner's] claims are now procedurally barred under [state] law.'" <u>Gray</u>, 518 U.S. at 161 (alteration in original) (citations omitted). "However, the procedural bar that gives rise to exhaustion provides an independent and adequate state-law ground for the conviction and sentence, and thus prevents federal habeas corpus review of the defaulted claim, unless the petitioner can demonstrate cause and prejudice for the default." <u>Id.</u> at 162.

Ordinarily procedural bar issues are resolved first, but courts have recognized that "[p]rocedural bar issues are not infrequently more complex than the merits issues . . . so it may well make sense in some instances to proceed to the merits if the result will be the same." <u>Franklin</u>, 290 F.3d at 1232. Accordingly, the Court will proceed to review Petitioner's claim de novo. <u>See</u> <u>Berghuis</u>, 560 U.S. at 390 ("Courts can . . . deny writs of habeas corpus under § 2254 by engaging in de novo review when it is unclear whether AEDPA deference applies, because a habeas petitioner will not be entitled to a writ of habeas corpus if his or her claim is rejected on de novo review . . . .").

### 2. *Strickland* Legal Standard

The clearly established federal law governing ineffective assistance of counsel claims is <u>Strickland v. Washington</u>, 466 U.S. 668 (1984). In a petition for writ of habeas corpus alleging ineffective assistance of counsel, the court must consider two factors. <u>Strickland</u>, 466 U.S. at 687. First, the petitioner must show that counsel's performance was deficient, requiring a showing that counsel made errors so serious that he or she was not functioning as the "counsel" guaranteed by the Sixth Amendment. <u>Id.</u> at 687. The petitioner must show that counsel's representation fell below an objective standard of reasonableness, and must identify counsel's

alleged acts or omissions that were not the result of reasonable professional judgment considering the circumstances. <u>Richter</u>, 562 U.S. at 105 ("The question is whether an attorney's representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom.") (citing <u>Strickland</u>, 466 U.S. at 690). Judicial scrutiny of counsel's performance is highly deferential. A court indulges a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. <u>Strickland</u>, 466 U.S. at 687. A reviewing court should make every effort "to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at that time." <u>Id.</u> at 689.

Second, the petitioner must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result would have been different. It is not enough "to show that the errors had some conceivable effect on the outcome of the proceeding." <u>Strickland</u>, 466 U.S. at 693. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." <u>Id.</u> at 694. A court "asks whether it is 'reasonable likely' the result would have been different. . . . The likelihood of a different result must be substantial, not just conceivable." <u>Richter</u>, 562 U.S. at 111–12 (citing <u>Strickland</u>, 466 U.S. at 696, 693). A reviewing court may review the prejudice prong first. See <u>Pizzuto v. Arave</u>, 280 F.3d 949, 955 (9th Cir. 2002).

3.  <u>Merits Analysis</u>

In denying Petitioner's ineffective assistance of counsel claim, the California Court of Appeal stated:

**A. Failure to Request Pinpoint Instruction on Heat of Passion**
Hanson, joined by Esquer, argues his trial counsel rendered ineffective assistance of counsel when he failed to request modified versions of CALJIC No. 8.73[35] and

---

[35] CALJIC No. 8.73 provides: "If the evidence establishes that there was provocation which played a part in inducing an unlawful killing of a human being, but the provocation was not sufficient to reduce the homicide to manslaughter, you should consider the provocation for the bearing it may have on whether the defendant killed with or without deliberation and premeditation."

CALCRIM No. 522 provides: "Provocation may reduce a murder from first degree to second degree [and may reduce a murder to manslaughter]. The weight and significance of the provocation, if any, are for you to decide.

"If you conclude that the defendant committed murder but was provoked, consider the provocation in deciding whether the crime was first or second degree murder. [Also, consider the provocation in deciding whether the defendant committed murder or manslaughter.]"

CALCRIM No. 522 on the issue of provocation.[36] They contend the instructions given "did not advise the jury that provocation that caused Esquer to attempt to kill under sudden heat of passion could reduce his ability to premediate and deliberate the offense."

The People respond that counsel could have reasonably determined the instructions given were adequate and there was no prejudice in any event.

## 1. Standard of Review

Esquer and Hanson bear the burden of proving their claim on appeal. (*People v. Mattson* (1990) 50 Cal.3d 826, 876–877.) "To secure reversal of a conviction upon the ground of ineffective assistance of counsel under either the state or federal Constitution, a defendant must establish (1) that defense counsel's performance fell below an objective standard of reasonableness, i.e., that counsel's performance did not meet the standard to be expected of a reasonably competent attorney, and (2) that there is a reasonable probability that [the] defendant would have obtained a more favorable result absent counsel's shortcomings." (*People v. Cunningham* (2001) 25 Cal.4th 926, 1003; see generally *Strickland v. Washington* (1984) 466 U.S. 668, 687–694.) " 'A reasonable probability is a probability sufficient to undermine confidence in the outcome.' " (*People v. Cunningham, supra,* at p. 1003.) "[I]n assessing a Sixth Amendment attack on trial counsel's adequacy mounted on *direct appeal*, competency is *presumed* unless the record *affirmatively* excludes a rational basis for the trial attorney's choice." (*People v. Musselwhite* (1998) 17 Cal.4th 1216, 1260; accord, *People v. Stewart* (2004) 33 Cal.4th 425, 459.)

## 2. No Error and No Prejudice

The decision on which jury instructions to request is inherently a tactical decision to be made by counsel. (*People v. Padilla* (2002) 98 Cal.App.4th 127, 136–137.) Tactical decisions must be viewed based upon facts at the time, not in hindsight, and rarely warrant a reversal. (*People v. Hinton* (2006) 37 Cal.4th 839, 876.)

CALJIC No. 8.73 is based on the decision in *People v. Valentine* (1946) 28 Cal.2d 121 (*Valentine*). (*Rogers, supra,* 39 Cal.4th at p. 879.) *Valentine,* which is cited by Esquer and Hanson in support of their argument, involved multiple instructional errors. In a later case, the California Supreme Court held that CALJIC No. 8.73 is a pinpoint instruction and, in doing so, it distinguished *Valentine* as involving "a host of instructional errors." (*Rogers, supra,* at p. 879.) The court explained, "In the absence of instructional errors such as were present in *Valentine,* the standard manslaughter instruction is not misleading because the jury is told that premeditation and deliberation is the factor distinguishing first and second degree murder. Further, the manslaughter instruction does not preclude the defense from arguing that provocation played a role in preventing the defendant from premeditating and deliberating; nor does it preclude the jury from giving weight to any evidence of provocation in determining whether premeditation existed." (*Id.* at p. 880.)

In this case, the trial court instructed the jury on the general principles of law, including attempted murder (CALCRIM No. 600), premeditation and deliberation (CALCRIM No. 601) and heat of passion attempted voluntary manslaughter (CALCRIM No. 603); and there is no claim the instructions given were incorrect

---

[36] As Esquer and Hanson acknowledge, the trial court had no sua sponte duty to give CALJIC No. 8.73 and CALCRIM No. 522, as they are pinpoint instructions. (*People v. Nelson* (2016) 1 Cal.5th 513, 541–542; *People v. Rogers* (2006) 39 Cal.4th 826, 878–879 (*Rogers*); *People v. Windfield* (2016) 3 Cal.App.5th 739, 761.)

or misleading (*People v. Jones* (2014) 223 Cal.App.4th 995, 1001; *People v. Hernandez* (2010) 183 Cal.App.4th 1327, 1333–1334). In addition, trial counsel highlighted the issue for the jury, arguing Esquer was provoked by being called a "buster" and, under the circumstances, there was no premeditation or deliberation. (See *People v. Jones, supra*, at p. 1002.)

We find the instructions given adequately addressed the interplay between provocation and premeditation and deliberation, and we must presume the jury followed the instructions. (*Rogers, supra*, 39 Cal.App.4th at p. 880; *People v. Hernandez, supra*, 183 Cal.App.4th at pp. 1333–1334.) Counsel could have reasonably concluded the instructions, which correctly stated the law, were adequate to address the issue, and Esquer and Hanson "fail[ ] to show that there could be no conceivable reason for trial counsel not to request such a clarifying instruction." (*People v. Nguyen* (2015) 61 Cal.4th 1015, 1051–1052.)

Even if we were to assume error, however, it was not prejudicial. The prosecution's case regarding premeditation and deliberation was strong and the evidence of provocation stemming from gang slurs was comparatively weak. (*People v. Najera* (2006) 138 Cal.App.4th 212, 226 (*Najera*).) Thus, we find no reasonable probability Esquer and Hanson would have obtained a more favorable result had counsel requested these pinpoint instructions, and we reject their ineffective assistance of counsel claims. (*People v. Cunningham, supra*, 25 Cal.4th at p. 1003.)

*Esquer*, 2017 WL 1315678, at *22–24 (footnotes in original).

Petitioner contends that counsel should have requested that the trial court give CALJIC No. 8.73 and CALCRIM No. 522, which instruct the jury to "consider the provocation for the bearing it may have on whether the defendant killed with or without deliberation and premeditation" and to "consider the provocation in deciding whether the defendant committed murder or manslaughter," respectively. However, even without these pinpoint instructions, the jury was instructed to consider provocation in determining whether Petitioner committed attempted murder or attempted voluntary manslaughter as follows:

An attempted killing that would otherwise be attempted murder is reduced to attempted voluntary manslaughter if the defendant attempted to kill someone because of a sudden quarrel or in the heat of passion. The defendant attempted to kill someone because of a sudden quarrel or in the heat of passion if, one, the defendant took at least one direct but ineffective step toward killing a person; two, the defendant intended to kill that person; three, the defendant attempted the killing because he was provoked; four, the provocation would have caused a person of average disposition to act rashly without due deliberation, that is with passion rather than due attempt; five, the attempted killing was a rash act done under the influence of intense emotion that obscured the defendant's reasoning or judgment.

(6 RT 1063–64). Even if the alleged provocation was not sufficient to reduce the attempted murder to attempted voluntary manslaughter, the trial court also instructed with respect to

premeditation and deliberation:

> The defendants deliberated if they carefully weighed the considerations for and against their choice and knowing the consequences decided to kill. The defendant has premeditated if they decided to kill before acting. The length of time the person spends considering whether to kill does not alone determine whether the attempted killing is deliberate and premeditated.
>
> The amount of time required for deliberation and premeditation may vary from person to person, and according to the circumstances. A decision to kill made rashly, impulsively, or without careful consideration of the choice and its consequences is not deliberate and premeditated.
>
> On the other hand, a cold, calculated decision to kill can be reached quickly. . . . The test is the extent of the reflection, not the length of time. The People have the burden of proving this allegation beyond a reasonable doubt. If the people have not met this burden, you must find this allegation has not been proved.

(6 RT 963–64).

The Court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," Strickland, 466 U.S. at 689, and Petitioner has not overcome the presumption that counsel reasonably concluded the given instructions correctly and adequately addressed provocation and its impact on Petitioner's ability to premediate and deliberate. Moreover, Petitioner has not established "there is a reasonable probability that . . . the result of the proceeding would have been different," Strickland, 466 U.S. at 694, if trial counsel had requested CALJIC No. 8.73 and CALCRIM No. 522, especially in light of counsel emphasizing the issue for the jury and arguing that Petitioner was provoked by being called a "buster" and thus, could not have premeditated or deliberated. (6 RT 1009, 1014, 1018, 1020–22).

Based on the foregoing, the Court finds that Petitioner is not entitled to habeas relief for ineffective assistance of counsel, and Petitioner's third claim should be denied.

**D. Sentence**

In his fourth claim for relief, Petitioner asserts that his sentence is cruel and unconstitutional and that the trial court's imposition of the upper term on two of his counts of conviction violated his Sixth Amendment right to a jury trial. (ECF No. 1 at 11). Respondent argues that these claims were not fairly presented to the California Supreme Court and thus, are unexhausted. Respondent contends, however, that the claims should be denied as Petitioner does not raise a colorable federal claim for relief. (ECF No. 17 at 56–57).

Petitioner's claims challenging his sentence were not raised on direct appeal or in his subsequent petition for review. However, pursuant to 28 U.S.C. § 2254(b)(2), the Court may deny an unexhausted claim on the merits "when it is perfectly clear that the [petitioner] does not raise even a colorable federal claim." Cassett v. Stewart, 406 F.3d 614, 624 (9th Cir. 2005) (adopting the standard set forth in Granberry v. Greer, 481 U.S. 129, 135 (1987)).

1. Eighth Amendment

The Eighth Amendment "does not require strict proportionality between crime and sentence but rather forbids only extreme sentences that are grossly disproportionate to the crime." Graham v. Florida, 560 U.S. 48, 60 (2010) (internal quotation marks and citations omitted). See also Lockyer v. Andrade, 538 U.S. 63, 77 (2003) ("The gross disproportionality principle reserves a constitutional violation for only the extraordinary case."). The Supreme Court has cautioned that "federal courts should be 'reluctan[t] to review legislatively mandated terms of imprisonment,' and that 'successful challenges to the proportionality of particular sentences' should be 'exceedingly rare.'" Hutto v. Davis, 454 U.S. 370, 374 (1982) (quoting Rummel v. Estelle, 445 U.S. 263, 274, 272 (1980)).

Here, Petitioner was convicted of six counts of attempted murder, four of which were committed with premeditation and deliberation, and two counts of assault with a firearm. Petitioner was sentenced to four terms of life with the possibility of parole, six terms of twenty-five years to life, and a total determinate term of twenty-five years and eight months. Esquer, 2017 WL 1315678, at *1. The Supreme Court has upheld life sentences for less serious offenses. See, e.g., Ewing v. California, 538 U.S. 11, 30–31 (2003) (twenty-five years to life for recidivist convicted of theft in excess of $400); Andrade, 538 U.S. at 70, 77 (two consecutive terms of twenty-five years to life for recidivist convicted of $150 theft of videotapes); Harmelin, 501 U.S. at 961, 996 (life without possibility of parole for first-time offender convicted of possession of 672 grams of cocaine). A fortiori, a sentence of life with the possibility of parole for multiple counts of attempted murder does not constitute cruel and unusual punishment. See Rummel, 445 U.S. at 274 ("[O]ne could argue without fear of contradiction by any decision of this Court that for crimes concededly classified and classifiable as felonies, that is, as punishable by significant

terms of imprisonment in a state penitentiary, the length of the sentence actually imposed is purely a matter of legislative prerogative."). As it is "perfectly clear" that Petitioner does not raise a colorable Eighth Amendment claim, the Court may deny this claim on the merits pursuant to 28 U.S.C. § 2254(b)(2).

2. Sixth Amendment

In Apprendi v. United States, 530 U.S. 466 (2000), the Supreme Court held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." 530 U.S. at 490. In Blakely v. Washington, 542 U.S. 296 (2004), the Supreme Court clarified that "the 'statutory maximum' for Apprendi purposes is the maximum sentence a judge may impose *solely on the basis of the facts reflected in the jury verdict or admitted by the defendant*." 542 U.S. at 303 (emphasis in original). However, "when a trial judge exercises his discretion to select a specific sentence within a defined range, the defendant has no right to a jury determination of the facts that the judge deems relevant." United States v. Booker, 543 U.S. 220, 233 (2005).

Applying the Apprendi-Blakely line of cases, the Supreme Court found unconstitutional California's determinate sentencing law, which prescribed lower, middle, and upper term sentences and required courts to impose the middle term unless the court found that mitigating or aggravating circumstances, established by a preponderance of the evidence, justified a lower or upper term. Cunningham v. California, 549 U.S. 270, 274, 277–78 (2007). The Supreme Court distinguished Booker, noting that "[i]f the jury's verdict alone does not authorize the sentence, if, instead, the judge must find an additional fact to impose the longer term, the Sixth Amendment requirement is not satisfied." Cunningham, 549 U.S. at 290.

In response to Cunningham, the California legislature amended the determinate sentencing law, which retained the lower, middle, and upper terms, but eliminated the presumptive middle term and "provide[d] that the choice of the appropriate term would rest within the sound discretion of the court." Creech v. Frauenheim, 800 F.3d 1005, 1016 (9th Cir. 2015) (alteration in original) (internal quotation marks omitted) (quoting 2007 Cal. Stat. 93). The

Ninth Circuit has held that "it was not contrary to or an unreasonable application of clearly established Supreme Court law [for the state court] to conclude that California's revised determinate sentencing law, which provides trial courts with discretion to decide among three sentences, is constitutional under <u>Apprendi</u>." <u>Creech</u>, 800 F.3d at 1009.

Here, the trial judge imposed the upper sentencing terms on counts 2 and 6. (6 RT 1152–54). Before announcing Petitioner's sentence, the trial judge stated in pertinent part:

> Mr. Esquer, I don't have as much trouble sentencing you that I had with Mr. Hanson. I've watched you throughout the trial, and listened to the evidence. I'm convinced of several things. Number one, you are a rock-solid gang banger. And you will use a deadly weapon or deadly force whenever you want to, wherever you want to. And that's been proven abundantly by this trial, the callousness of your actions.
>
> If you want to go have a gang-bang fight and shoot it out somewhere on some gang territory, that's one thing. But when you come into a shopping mall full of innocent men, women, and children and do your work, that is reprehensible. . . .
>
> I don't think any of us can appreciate how bad that was unless we were at the mall minding our own business, trying to shop, and you, for whatever reason, pull out a gun and start shooting like crazy.
>
> I don't think that jury—we'll never know, but I don't think the jury had that much trouble arriving at a verdict for you. I think the jury probably was spending most of their time trying to figure out whether there was sufficient evidence for aiding and abetting of Mr. Hanson. I don't think they had any problem at all finding guilt for you as charged.

(6 RT 1151–52). The trial judge exercised his discretion to select the upper term within a defined range based on the judge's observation of Petitioner throughout trial, "listen[ing] to the evidence," and the reprehensibility of Petitioner opening fire on a Friday night in "a shopping mall full of innocent men, women, and children." The trial judge did not, and was not required to, find an additional fact to impose the upper term. As it is "perfectly clear" that Petitioner does not raise a colorable Sixth Amendment claim, the Court may deny this claim on the merits pursuant to 28 U.S.C. § 2254(b)(2).

## V.

## RECOMMENDATION

Based on the foregoing, the undersigned HEREBY RECOMMENDS that the petition for writ of habeas corpus be DENIED.

This Findings and Recommendation is submitted to the assigned United States District Court Judge, pursuant to the provisions of 28 U.S.C. § 636 (b)(1)(B) and Rule 304 of the Local Rules of Practice for the United States District Court, Eastern District of California. Within **THIRTY (30) days** after service of the Findings and Recommendation, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendation." Replies to the objections shall be served and filed within fourteen (14) days after service of the objections. The assigned District Judge will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636(b)(1)(C). The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. Wilkerson v. Wheeler, 772 F.3d 834, 839 (9th Cir. 2014) (citing Baxter v. Sullivan, 923 F.2d 1391, 1394 (9th Cir. 1991)).

IT IS SO ORDERED.

Dated:   **August 15, 2018**

UNITED STATES MAGISTRATE JUDGE